IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                  Civ. No. 19-552

$112,020.00 IN UNITED STATES CURRENCY,

    *Defendant-in-rem.*

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges as follows:

#### NATURE OF THE ACTION

1. This is a civil action to forfeit and condemn to the use and benefit of the United States of America property involved in violations of the Controlled Substances Act and 18 U.S.C. § 1952 that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

#### DEFENDANT *IN REM*

2. The defendant *in rem* consists of the following:

    A. One hundred twelve thousand twenty dollars ($112,020.00) in United States Currency, (hereafter referred to as "Defendant Currency").

3. The Defendant Currency was seized by the Drug Enforcement Administration on January 28, 2019, in the District of New Mexico.

4. The Defendant Currency is now, and during the pendency of this action will be, in the jurisdiction of this Court.

## JURISDICTION AND VENUE

5. The United States District Court for the District of New Mexico has subject matter jurisdiction under 28 U.S.C. §§ 1345, 1355(a) and 1356.

6. Venue for this civil forfeiture action is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and the property is found in this district. Upon the filing of this complaint, the Defendant Currency will be arrested by execution of a Warrant for Arrest *In Rem* in the District of New Mexico.

## FACTS

7. On January 28, 2019, Drug Enforcement Administration (DEA) Special Agent Jarrell Perry reviewed an Amtrak Train Passenger Name Record (PNR). Isaac Sheppard and Erica Hunter were traveling one-way from Detroit, Michigan to Las Vegas, Nevada. The ticket was purchased with cash for $793.00 on January 26, 2019 at 1:19 p.m. in the Amtrak Train Station in Detroit, Michigan. The PNR reflected travel in sleeper car number 330, bedroom number 2. The Amtrak Train departs Detroit, Michigan on January 27, 2019 at 6:33 a.m.

8. On January 28, 2019, Agent Perry, DEA Task Force Officer (TFO) Frank Chavez, TFO Clarence Davis, and TFO Jordan Grady were at the Amtrak Train Station in Albuquerque, New Mexico to meet the westbound train number three scheduled stop in Albuquerque. Agent Perry boarded coach car number 330 and walked to bedroom number 2.

9. The curtain to bedroom number 2 was closed and the sliding glass door was opened. Agent Perry stood to the left of the doorway and knocked on the doorway to bedroom number 2. Agent Perry said, "Hello." A female voice coming from inside of the bedroom said,

"Yeah." Agent Perry stated that he was a police officer and asked for permission to speak with her. She responded with, "Yeah."

10. Agent Perry displayed his DEA badge and identified himself as a police officer. He requested and received consent to speak with Erica Latrese Hunter. Agent Perry asked Hunter if she had her ticket. Hunter said, "What's this about?" Hunter began to search through her purse. Agent Perry asked where she was traveling. Hunter said Vegas. Agent Perry asked Hunter where she was traveling from and she said, "Muskegon."

11. Hunter handed Agent Perry an Amtrak Train ticket in the name of Erica Hunter. Agent Perry reviewed the ticket and immediately returned it to her. Agent Perry asked Hunter if she was traveling with anyone else and she said, "My friend." Agent Perry asked Hunter if she had identification with her and she said, "Uh-huh." Agent Perry asked Hunter for permission to see her identification. Hunter began to search through her purse. Agent Perry asked Hunter if she lived in Michigan or Las Vegas and she said, "Michigan." Agent Perry asked Hunter if she was traveling to Vegas for vacation or work and she said, "Vacation." Agent Perry asked Hunter if she had been to Vegas in the past and she said, "Uh-huh." Agent Perry asked Hunter if she had traveled on the Amtrak Train in the past and she said, "No."

12. Hunter handed Agent Perry a Michigan identification card in the name of Erica Latrese Hunter. Agent Perry reviewed the identification and immediately returned it to Hunter. Agent Perry explained that due to the lack of security on the Amtrak Train that there is a problem with passengers utilizing the Amtrak Train to transport contraband. Agent Perry asked Hunter if she had anything illegal with her and she said, "No."

13. Agent Perry asked Hunter if she had any other luggage with her besides her purse and she said, "My bag." Hunter pointed to a small bag that she had lying on the floor by her feet.

Agent Perry asked Hunter if she had any luggage downstairs and she said, "No." Agent Perry asked Hunter if they had any other luggage inside of her bedroom and she said, "No."

14. Hunter said, "We going there because his sister is there, so we buying some stuff when we get there."

15. Agent Perry requested and received consent from Hunter to enter her bedroom to search her belongings. Agent Perry walked into the bedroom and searched Hunter's purse/small bag with negative results for contraband. Agent Perry requested and received consent from Hunter to search her bedroom.

16. Agent Perry located a black duffel under the Hunter's seat. Agent Perry asked Hunter if the black duffel bag belonged to her and she said, "No, that's my friend's bag." Agent Perry asked Hunter if she had anything inside of the black duffel bag that belonged to her or was all the contents her friends. Hunter said, "Some of that stuff, it should, I think I got some shoes in there." Agent Perry asked Hunter that since she does have belongings inside of the duffel bag if she would give Agent Perry permission to search the duffel bag. Hunter said, "I can't give you permission to search his because it ain't mines. You gotta ask him."

17. A few minutes later, Agent Perry observed a male, later identified as Isaac Johnson Sheppard, walk up the stairway to the hallway where Agent Perry was standing near bedroom number 2. Agent Perry displayed his DEA badge and identified himself as a police officer to Sheppard. Agent Perry requested and received consent from Sheppard to speak with him. Agent Perry asked Sheppard for permission to see his identification and Sheppard handed Agent Perry a Michigan identification card in the name of Isaac Johnson Sheppard. Agent Perry reviewed the identification and immediately returned it to Sheppard.

4

18.     Agent Perry informed Sheppard that Hunter earlier told Agent Perry that the black duffel bag belonged to Sheppard. Sheppard said, "Yeah." Sheppard said, "You can search it, there's money in there too." Agent Perry asked Sheppard if he would give permission to search the black bag. Sheppard said, "I ain't got nothing, go ahead." Hunter said, "You got my money in there." Sheppard said, "Yeah you're money in there, what can I do about it?" Sheppard said, "You wanna search the bag, search the bag."

19.     Agent Perry asked Hunter, "So your money is in here ma'am?" Hunter said, "Yeah, I thought my money was in my bag I don't know why he put all my money in his bag for."

20.     Agent Perry opened up the black duffel bag and observed numerous clear plastic zip-lock bags containing large rubber-band wrapped bundles of money contained inside of the bags.

21.     Agent Perry observed that the zip lock bags were concealed inside of a man's jacket. Agent Perry knew from his training and experience that the large rubber-band wrapped bundles of money inside of zip-lock bags were consistent with other bundles of money that were involved in the illegal narcotics business.

22.     Agent Perry asked Hunter if all the money belonged to her and Hunter said, "Yeah." Agent Perry asked Hunter how much money she had and Hunter said, "It's about a hundred and ten thousand. That's the reason I'm glad I brought my lottery tickets and my bank statements because I, I knew it. Because that's how they do because we the only black people on this train."

23.     Hunter said that she had her bank statements on her phone and her lottery winnings. Hunter showed Agent Perry receipts that had various $5,000.00 amounts on paper that

showed the Michigan lottery. Agent Perry asked Hunter if all the money was hers or part was Sheppard's. Hunter said, "Naw, that's my money, I didn't know he put all his money, all money in his bag." Agent Perry asked Hunter where she had the money before and Hunter said, "I had it in my bag, when we was at home I said because I don't have enough room. Shouldn't be a problem with money anyway because money ain't illegal to take out of town."

24. Agent Perry explained to Hunter that it is not illegal to have money, but that transporting a large sum of money could be illegal depending the reason and circumstances. Hunter handed Agent Perry paperwork with the Michigan lottery on the top showing winnings of $5,000.00 each with the same date on each document. Hunter said that she was going to Las Vegas to gamble and vacation.

25. Sheppard said that none of the money belonged to him. They were supposed to stay with his cousin, but his cousin is not answering her phone. Agent Perry asked Hunter and Sheppard for their identification. Agent Perry informed Hunter and Sheppard that the various bundles of money wrapped in rubber-bands, were suspicious because they were placed inside of zip-lock bags and concealed inside of a jacket inside of a duffel bag was suspicious. Sheppard asked Agent Perry how they were supposed to have the money. Agent Perry asked Sheppard if he put the rubber-bands around the money and Sheppard said no. Hunter said that she put the rubber-bands around the money and did not have any idea how much was in each bundle with rubber-bands.

26. Hunter said that the money was in the bank before her trip and was not willing to provide Agent Perry with the name of the bank. Hunter said that she had her bank statements on her phone.

27. Agent Perry asked Hunter and Sheppard if they had been arrested in the past. Hunter said yes, but not for drugs and money. Sheppard said that he had been arrested for drugs in the past, but had not had money seized from him in the past.

28. Agent Perry requested and received consent from Sheppard to pat down his person. Agent Perry conducted a pat down of Hunter, looking for contraband, with negative results.

29. Agent Perry asked Hunter if she wanted to show Agent Perry the bank receipts that she had on her phone and Hunter said no. Hunter said that the she had some of the receipts on her phone, but that she did not have all of them. Hunter said that she banks at PNC, but stated that she does not keep her money in her bank. Hunter said that the money was probably at her house.

30. Agent Perry informed Hunter that the zip-lock bags of money was being seized as proceeds of illegal narcotics. Agent Perry obtained various pictures of the money inside of the bedroom.

31. TFO Davis and TFO Chavez placed the unknown amount of United States Currency inside of various sealed envelopes, in the presence of Hunter and Sheppard. TFO Davis, TFO Chavez and Hunter signed the top portion of the sealed envelopes. Agent Perry filled out a personal property receipt and provided a copy to Hunter. Agent Perry obtained photographs of Hunter and Sheppard and explained the process for Hunter to file a claim for the unknown amount of United States Currency that was being seized from her. Agent Perry obtained various photographs of the paperwork that was in the possession of Hunter.

32. TFO Chavez and TFO Davis transported the sealed envelope to the DEA Albuquerque District Office and placed it into the high value evidence vault.

33. On January 29, 2019, the sealed envelope was removed from the high value evidence vault by TFO Chavez and TFO Davis to open up the sealed envelope to obtain various photographs and to allow a narcotics canine to conduct a sniff.

34. TFO Grady deployed his trained and certified drug detection canine on currency. TFO Grady informed TFO Chavez that his canine alerted to the currency for the odor of illegal controlled substance.

35. TFO Chavez and TFO Davis transported the currency to Loomis, Inc. for an official count. The currency amount totaled $112,020 in U.S. Currency in the following denominations: 201 in $100 dollar bills, 148 in $50 dollar bills, 4,136 in $20 dollar bills, 144 in $10 dollar bills, 70 in $5 dollar bills, and 10 in $1 dollar bills.

### First Claim For Relief

36. The United States incorporates by reference the allegations in paragraphs 1 through 35 as though fully set forth.

37. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

38. Defendant Currency was furnished, or intended to be furnished, in exchange for a controlled substance, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

39. The United States incorporates by reference the allegations in paragraphs 1 through 35 as though fully set forth.

40. Title 18, United States Code, Section 981(a)(1)(C) provides, in part, for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specific unlawful activity" (SUA) as defined in 18 U.S.C. § 1956(c)(7), or conspiracy to commit such offense.

41. 18 U.S.C. § 1952 prohibits interstate and foreign travel or transportation with the intent to (1) distribute the proceeds of any unlawful activity; (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity. Unlawful activity is defined in 18 U.S.C. § 1952(b).

42. Defendant Currency is the proceeds of a violation of 18 U.S.C. § 1952 or is the proceeds traceable to such property and, is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE: Plaintiff seeks arrest of Defendant Currency and forfeiture of same to Plaintiff, determination of the validity and priority of claims of the Claimants and any Unknown Claimants to the Defendant Currency, costs and expenses of seizure and of this proceeding, and other proper relief.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney


*/s/ STEPHEN R. KOTZ*
STEPHEN R. KOTZ
BRANDON FYFFE
Assistant U.S. Attorneys
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274

## 28 U.S.C. § 1746 DECLARATION

I am a Special Agent with the Drug Enforcement Administration who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters I believe them to be true.

Dated: 6/14/19

_____
Jarrell W. Perry, Special Agent
Drug Enforcement Administration

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS
$112,020.00 IN UNITED STATES CURRENCY

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury – Medical Malpractice

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**TORTS — PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- [x] 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 1957 , 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 1960 , 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 1952 and 21 U.S.C. § 881(a)(6)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE: 6/13/2019
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____